# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### SOUTH BEND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case Nos. 3:10-CR-00120 (01) JD |
| | ) | 3:10-CR-00126 (02) JD |
| JEREMIE SHENEMAN | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

On June 11, 2012, the Court held an evidentiary sentencing hearing for the purpose of determining the guideline calculations in cases 3:10-cr-120 ("120 case") and 3:10-cr-126 ("126 case").[1]  Having previously denied the defendant's two respective motions for new trial, the Court now makes the following findings based upon the preponderance of the evidence standard and rules on defendant Jeremie Sheneman's objections to the presentence report ("PSR") dated July 5, 2011, as revised on September 15, 2011, and filed on September 16, 2011 [120 case, DE 109; 126 case, DE 116].[2]  For the reasons that follow, Jeremie Sheneman's objections are overruled in part and sustained in part.[3]

---

[1]For sentencing purposes, counsel have no objection to grouping Jeremie Sheneman's seven convictions for wire fraud because the offense level is determined largely on the basis of the total amount of harm or loss. § 3D1.2(d) cmt. n. 6 (explaining that counts are to be grouped together when the defendant is convicted of five counts of mail fraud and ten counts of wire fraud, even if the counts arise from various schemes, because each involves a monetary objective).

[2]The PSR originally relied on the 2010 edition of the guidelines, but with counsels' assent the Court employs the 2011 edition after verifying that no substantive changes affect the guideline calculations.

[3]The government has no objections to the PSR [120 case, DE 106; 126 case, DE 86], is not seeking forfeiture in either case due to the lack of forfeitable assets, and is not seeking restitution in the 120 case given the unavailability of records necessary to prove entitlement to restitution by a preponderance of the evidence [120 case, DE 106], but is seeking restitution in the 126 case in the amount of $269,967.50, as discussed *infra*, based on the same evidence submitted during the sentencing of Michael Sheneman [126 case, DE 109-1].

# I. Loss Amount

Defense counsel first objects to the PSR's calculation of the amount of loss resulting from Jeremie Sheneman's criminal conduct, which the probation officer determined to be in excess of $1 million, resulting in a 16 level enhancement to Jeremie Sheneman's offense level, consistent with guideline § 2B1.1(b)(1)(I).

Application note 3 to § 2B1.1 explains that loss is the greater of actual loss or intended loss. Here, the government relies on actual loss calculations and the guidelines define "actual loss" as "the reasonably foreseeable pecuniary harm that resulted from the offense." § 2B1.1 cmt. n. 3(A)(i). Pecuniary harm is defined as monetary harm or harm that can be readily measurable in money but excludes emotional distress, harm to reputation, or non-economic harms. *Id*. at cmt. n. 3(A)(iii). For pecuniary harm to be reasonably foreseeable, the defendant must have known or, under the circumstances, reasonably should have known, that the harm was a potential result of the offense. *Id*. at cmt. n. 3(A)(iv). But the loss calculation need not be exact; "[t]he court need only make a reasonable estimate of the loss." *Id.* at n. 3(C). "The estimate of the loss shall be based on available information, taking into account . . . factors such as . . . [t]he fair market value of the property unlawfully taken . . . [and] [t]he approximate number of victims multiplied by the average loss to each victim." *Id.* That note further states that the amount of loss should be reduced by "the amount the victim has recovered at the time of sentencing from disposition of the collateral." *Id.* at (E)(ii); *accord United States v. Cage*, 365 Fed.Appx. 684, 686 (7th Cir. 2010) (unpublished opinion) (holding that in a mortgage fraud case, the amount recovered through the banks' sale of properties should factor into the calculation of actual loss).

The Seventh Circuit recently reiterated the appropriate method of calculating loss amount in a mortgage fraud case in *United States v. Green*, 648 F.3d 569 (7th Cir. 2011), stating that the bank's loss for each property equals the amount of the original loan minus the sale price the bank received after it resold the property. *Id.* at 584 (citing *United States v. Radziszewski*, 474 F.3d 480, 486-87 (7th Cir. 2007)); *see United States v. Serfling*, 504 F.3d 672, 680 (7th Cir. 2007) (applying *Radziszewski*); *see also United States v. Love*, 680 F.3d 994, 999 (7th Cir. 2012) (affirming the district court's method of calculating loss that involved subtracting the sales price for each property from the loan amount).[4]

In addition, since loss includes reasonably foreseeable pecuniary harm resulting from the offense, § 2B1.1 cmt. n. 3(A)(i), the calculation of loss (and the number of victims for that matter, *see infra*) include conduct relevant to, but not specified within, the counts of conviction, § 1B1.3(a)(2). *United States v. Locke*, 643 F.3d 235, 243 (7th Cir. 2011). In order for uncharged conduct to be relevant conduct and be used in determining loss amount, the conduct must fit within § 1B1.3(a)(1)(A), (1)(B) and be part of the "same course of conduct"[5] or "a common scheme or plan"[6] as the offense of conviction. § 1B1.3(a)(2) cmt. n. 9; *Locke*, 643 F.3d at 243 (identifying cases in which the objective evidence and findings by the sentencing judge was

_____

[4]This precedent directs the Court to consider the properties' original mortgage amounts, not judgment amounts, in computing the amount of loss, given that "[l]oss shall not include . . . [i]nterest of any kind, finance charges, late fees, penalties, amounts based on an agreed-upon return or rate of return, or other similar costs." § 2B1.1 cmt. n. 3(D)(i).

[5]Offenses are considered part of the same course of conduct if they are so related as to "warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses," and decisive factors include the "similarity of the offenses, the regularity (repetitions) of the offenses, and the interval between the offenses." § 1B1.3(a)(2) cmt. n. 9(B).

[6]Offenses are considered part of a common scheme if they involve common victims, common accomplices, common purpose, or similar modus operandi. § 1B1.3(a)(2) cmt. n. 9(A).

either sufficient or deficient in supporting the relevant conduct finding).

Under § 1B1.3(a)(1)(A), the defendant can be held responsible for all acts and omissions he "committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused." § 1B1.3(a)(1)(A). And, in the case of jointly undertaken criminal activity, whether charged as a conspiracy or not, the guidelines instruct that adjustments "shall be determined on the basis of . . . all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." § 1B1.3(a)(1)(B); *see United States v. Salem,* 657 F.3d 560, 564 (7th Cir. 2011); *United States v. McKanry*, 628 F.3d 1010, 1020 (8th Cir. 2011) (finding relevant conduct where "[the defendant] was an active participant in the overall scheme to deceive the lenders" because "[h]is participation began by engaging in dual contracting, and continued with deceptively providing funds for the down payments, signing documents containing statements he knew to be false, and lying to [an investigator]"); *United States v. Hayes*, 574 F.3d 460, 483-84 (8th Cir. 2009) (affirming the district court's calculation that included loss resulting from reasonably foreseeable acts taken in furtherance of the conspiracy). The scope of jointly undertaken criminal activity is not necessarily the same as the scope of the entire scheme. *United States v. Michael Sheneman*, 682 F.3d 623, 631 (7th Cir. 2012) (citing § 1B1.3, cmt. n. 2). In determining the scope of the criminal activity that a particular defendant agreed to jointly undertake, "the district court 'may consider any explicit agreement or implicit agreement fairly inferred from the conduct of the defendant and others.'" *Id*. (citing *Salem*, 657 F.3d at 564) (quoting § 1B1.3 cmt. n. 2)). Several factors are relevant in this determination, including: (1) the existence of a single scheme; (2) similarities in modus operandi; (3) coordination of activities among schemers; (4) pooling of resources or profits; (5) knowledge of the scope of the scheme;

and (6) length and degree of the defendant's participation of the scheme. *Id*.

**The 126 Case**

In the 126 case, Jeremie Sheneman and Michael Sheneman were convicted of 4 counts of wire fraud involving 4 properties identified in the counts of the indictment (505 N. Walnut Street, 1246 Diamond Avenue, 726 S. Brookfield Street, and 1922 W. 6th Street). At trial, however, the government presented evidence on 60 properties that it alleges were sold as a part of the mortgage fraud scheme for which the Shenemans were convicted. The government submitted charts[7] revealing that of the 60 properties, 36 properties were foreclosed upon [126 case, DE 99-1, sentencing exhibit 1]. The government was unable to produce any sales data for the 24 properties that were not foreclosed upon; however, the government relies on the Court's previous finding that of those 24 properties, 11 were transferred to the banks pursuant to a deed in lieu of foreclosure, 6 were demolished by the city, 4 were sold at tax sale, and the disposition of the other 3 properties could not be determined. The government confirmed during Jeremie Sheneman's sentencing hearing that no updated information relative to the disposition of these properties is available, but argues, as it did during the sentencing of Michael Sheneman, that the Court can estimate the loss resulting from these properties based on the average loss sustained from the 36 properties that were foreclosed upon.

---

[7]The government's charts [126 case, DE 99-1, 99-2] were originally submitted for purposes of Michael Sheneman's sentencing. Given that Michael and Jeremie Sheneman were tried together on charges involving the same fraudulent mortgage scheme, the government relies on these same exhibits for purposes of Jeremie Sheneman's sentencing [126 case, DE 123]. During Jeremie Sheneman's evidentiary hearing, the government introduced into evidence a chart revealing the same properties that were foreclosed upon [126 case, DE 99-1, sentencing exhibit 1] and a chart revealing the restitution that the government is seeking [126 case, DE 109-1, sentencing exhibit 2].

The defense argues that the government's method of calculating loss amounts to mere guesswork and it would be error to calculate loss based on an average deficiency per property without (1) considering mortgage payments that were made prior to the loans' default, and (2) reducing the loss by the amount that the lenders received after repossessing and selling the properties. The defense further argues that the amount of loss should not go beyond the loss sustained on the properties listed in the counts of conviction. However, the Court does not agree.

First, no evidence is available concerning the amount of mortgage payments made prior to the buyers default on the loans or concerning the amount received by lenders after repossessing and selling the properties (other than those identified in government's sentencing exhibit 1). Second, loss calculation need not be exact, but need only be a reasonable estimate of the loss based on available information—thus, the Court will use the information available to it to conduct a reasonable loss calculation. Third, any mortgage payments made would have been negligible given that the defaults occurred quickly (based upon the trial testimony of the four buyer victims) and substantial portions of the initial payments would have more than likely gone toward payment of the interest, which is not to be included in the loss calculation anyway. In any event, because Jeremie Sheneman has not produced any evidence tending to show that loss estimates based on government's sentencing exhibit 1 are inaccurate or unreliable, other than mere assertions which are insufficient, the Court calculates loss as detailed below.

The Court finds that the evidence presented at trial and sentencing establishes that Jeremie Sheneman did engage in mortgage fraud involving 60 properties, consistent with § 1B1.3(a)(1)(B) and (a)(2), as he was actively involved in a joint criminal undertaking with his

father, Michael Sheneman, which was part of the same course of conduct or common scheme or plan to defraud. Michael and Jeremie Sheneman acted in concert to buy houses for a small amount (or gain a power of attorney over houses) and quickly sell them for a much larger amount to turn a profit. Michael and Jeremie Sheneman, as evidenced by their actions, agreed to work as a team in this respect—Michael Sheneman often acted as the seller (or usually received a power of attorney to sell) and provided the financial backing to pad the buyers' bank accounts and to pay for the down payments, and Jeremie Sheneman falsified the loan documents which were sent to the lenders to secure mortgages. *See Michael Sheneman,* 682 F.3d at 631 (concluding that it was proper to find that the scope of the criminal activity that Michael and Jeremie Sheneman agreed to jointly undertake involved the fraudulent sale of real estate, which included fraudulently securing the buyers' financing, and therefore it was not err to consider the lenders' losses at sentencing).

This scheme is supported by the trial evidence summarized by this Court in its order dated May 18, 2012 [126 case, DE 150 at 8-22], as incorporated herein. In its previous order, the Court explained that the testimony of Tanya Boettcher and Lauren Duesler indicated that Jeremie Sheneman worked at Superior Mortgage, where Michael Sheneman frequented, and Jeremie Sheneman processed his own loans and worked directly with the lenders to get the loans to close quickly [126 case, DE 150 at 14-15]. Ms. Duesler observed Jeremie Sheneman cut the seller's signature from a purchase agreement and paste it onto a different purchase agreement that he completed after the buyer signed the blank agreement. *Id.* This testimony was consistent with the testimony of the buyers, Ms. Gladys Zoleko, Mr. Paul Davis, Mr. David Doolittle, and Mr. Gary Denaway ("4 buyers") [126 case, DE 150 at 10-13], who were referred to Jeremie

7

Sheneman to secure financing for the home purchases—properties which Michael and Jeremie Sheneman obtained either outright or by a power of attorney per the testimony of Elinor Tyl, Eric McGinness, and Kevin Shaw [126 case, DE 150 at 8-9]. Jeremie and Michael Sheneman lied to the buyers to get them to buy into the investment scheme, purchase multiple properties sight unseen, and sign-off on closing documents without sufficient time for review. The scheme took a great deal of coordination between Jeremie and Michael Sheneman and knowledge about their respective actions in furtherance of the scheme. *See Michael Sheneman,* 682 F.3d at 631 ("[t]he scheme as a whole hinged on unqualified buyers securing financing, and necessitated a high level of coordination between [Michael] Sheneman and [Jeremie Sheneman]."). In the end, the proceeds of the sales went to Jeremie and Michael Sheneman, while the unqualified buyers and unsuspecting lenders were left with defaulted loans.

At trial, Mr. Urbanowski[8] testified that in reality every cent of the money required for the down payments at the closings for all 60 properties purchased by Mr. Davies, Mr. Denaway, Mr. Doolittle, and Ms. Zoleko came from Michael Sheneman (minus some fees incurred for Ms. Zoleko's properties). In addition, of the 60 properties purchased by the 4 buyers, virtually all of the mortgages (excepting 4 of Mr. Davies' properties) were brokered through Superior Mortgage or Tri State Mortgage, where Jeremie Sheneman worked. Mr. Urbanowski also analyzed the amount of money that was placed into the 4 buyers' personal bank accounts by Michael Sheneman, in order to help qualify them for the loans, separate and apart from the down payment deposits, which included $20,000.00 to Mr. Davies (whose account balance was $869.00),

---

[8]Mr. Urbanowski, a forensic auditor with the U.S. Department of Housing and Urban Development, analyzed the financial records involved in the 126 case.

$45,000.00 to Mr. Denaway (whose account balance was $694.00), $25,000.00 to Mr. Doolittle, and $18,000.00 to Ms. Zoleko (whose account balance was $234.00).  Mr. Urbanowski testified that the proceeds of the sales often went to Michael Sheneman, yet that from June through October 2005, a total of $645,854.55 was transferred from Michael Sheneman's accounts to Jeremie Sheneman's accounts (although this amount has not been actually linked to the money made from the property sales).

Consistent with the factors listed in *Salem*, this Court finds that the scope of the criminal activity that Michael and Jeremie Sheneman agreed to undertake involved the fraudulent sale of real estate, which included inducing unsophisticated buyers to buy multiple substandard properties at once and fraudulently securing the unqualified buyers' financing, with each defendant serving as an active participant in the overall scheme to deceive—playing the role as detailed above. *Salem*, 657 F.3d at 564.  Clearly, Michael Sheneman's conduct was in furtherance of that joint criminal activity, because without his securing the majority of the properties to sell, enticing the 4 buyers to buy multiple houses at once, depositing tens of thousands of dollars into the buyers' accounts to inflate their balances, and obtaining certified checks to use at closing, the buyers would not have qualified for the mortgages and the closings would not have occurred.  Moreover, Michael Sheneman's actions were reasonably foreseeable to Jeremie Sheneman in connection with the joint criminal activity, because Jeremie Sheneman was involved in various meetings with Michael Sheneman and the buyers, and Jeremie Sheneman was responsible for filling out the loan applications for the unqualified buyers knowing that Michael Sheneman was providing many of the properties and all of the financial backing.  But for Michael Sheneman's role in the offense, the scheme would not have worked.

The conduct is undoubtedly part of a common scheme: it involves common victims—4 unsophisticated buyer victims who were inexperienced with purchasing and managing multiple rental properties; it involves common accomplices—a father/son team who acted in concert by using their knowledge of the real estate business and the lending practices of subprime lenders; it involves a common purpose—to sell properties to benefit the Shenemans by engaging in multiple acts of mortgage fraud; and, it involves similar modus operandi—falsification of mortgage loan applications, deposits to buyer bank accounts to enable them to qualify for loans, payment of down payments, etc.

As a result, the Court concludes by a preponderance of the evidence that the conduct involving all 60 properties sold to Mr. Davies, Mr. Denaway, Mr. Doolittle, and Ms. Zolecko is conduct relevant to Jeremie Sheneman and will be used in determining loss amount (and in calculating the number of victims, *see infra*). *See United States v. Cooks*, 589 F.3d 173, 185 (5th Cir. 2009) (holding that uncharged mortgage transactions qualified as relevant conduct because "they were the same type of mortgage fraud as those charged in the indictment and they include several common factors and people" with the defendant "walk[ing] away with the extra cash from the deal, with the lender taking the loss.").

Exhibit 1 from sentencing includes the available data from the 36 properties that were foreclosed upon. Of these 36 properties, the bank sold 3 for an amount in excess of the original mortgage amount. The 33 properties foreclosed upon for a loss had an original mortgage amount totaling $1,693,000.00.[9] The total amount bid at sheriff's sales was $1,032,149.50 (this number

---

[9]There is no dispute that lenders recouped less than the full value of the original loans on 33 of the 36 properties listed in government's sentencing exhibit 1, and that these losses were sustained by 9 different mortgage holders. These mortgage holders are victims of Jeremie

is referred to by the government as "foreclosure bid"; typically the amount of the credit bid by the lender and judgment holder, reflecting the properties fair market value). This left a deficit of $660,850.50. The 3 remaining properties had an original mortgage amount totaling $201,250.00, and the total amount bid at sheriff's sales amounted to $226,368.95, which resulted in the recovery of $25,118.95. When the deficiency amount of $660,850.50 is offset by $25,118.95,[10] then the deficit equals $635,731.55—an average loss of $17,659.21 per property ($635,731.55 divided by 36). Because the loss calculation need only be a reasonable estimate of the loss based on available information, the Court uses this per property average loss figure to estimate the loss for the remaining 24 properties for which there are no financial records. For those 24 properties, the deficit totals $423,821.04 ($17,659.21 multiplied by 24). All together, the deficits produced a total loss of $1,059,552.59 ($635,731.55 added to $423,821.04).[11]

As to the 4 buyers, they too suffered monetary losses in an amount equal to the time and

---

Sheneman's conduct since a victim is "any person who sustained any part of the actual loss determined under subsection (b)(1)," § 2B1.1(b)(2)(A)(i) cmt. n. 1, 3, and Jeremie Sheneman can be held responsible for conduct relevant to, but not specified within, his counts of conviction, because as previously detailed, *see supra* at 6-10, the jointly undertaken criminal activity is attributable to Jeremie Sheneman and is part of the same course of conduct and common scheme or plan as the offenses of conviction. *Locke*, 643 F.3d at 243-44 (citing § 1B1.3(a)(2)).

[10]*See* § 2B1.1 cmt. n. 3(E)(ii) (loss shall be reduced by the amount the victim has recovered at the time of sentencing from disposition of the collateral). Admittedly, in some instances, the gain to an individual investor in the scheme is not used to offset the loss to another individual investor in the scheme. § 2B1.1 cmt. n. 3(F)(iv).

[11]The Court also notes that this calculation is a very conservative estimate, favoring the interests of Jeremie Sheneman. For instance, the Seventh Circuit has explicitly acknowledged that using credit bids based on fraudulently inflated loan amounts to measure loss would surely understate the actual loss. *Green*, 648 F.3d at 584. Further, the loss amount does not adequately account for those properties demolished by the city, resulting in virtually a total loss. However, due to the lack of sales data available, the most practical way to reasonably estimate the loss in this case is to use the original mortgage values less the amounts bid at sheriff's sales. Even using these conservative loss figures, the amount of loss exceeds $1 million in the 126 case.

money they spent repairing properties (despite assurances that they were in rentable condition upon their sale).[12]  Also, the occasional rents received did not cover the amount of money spent, which included not only repair work, but money spent to pay mortgages on various properties which did not have tenants (despite assurances that the properties would have tenants).  Thus, the 4 buyers had out-of-pocket expenses that we cannot quantify today.  Similar to the loss sustained on the original mortgages, Jeremie and Michael Sheneman knew, or reasonably should have known, that the pecuniary harm suffered by the 4 buyers was a likely result of their jointly undertaken fraudulent scheme.  However, because the 4 buyers' losses cannot be reasonably quantified today, their losses do not result in any further increase in the offense level.

**The 120 Case**

In the 120 case, Jeremie Sheneman was convicted of 3 counts of wire fraud involving 2 properties identified in the counts of the indictment (11-9A 128th Street and 11-11 128th Street located in College Point, New York).  At trial, however, the government presented evidence on 8 properties [denoted as proprieties 3-10 on government's sentencing exhibit 3],[13] that it alleges were sold as part of the mortgage fraud scheme for which Jeremie Sheneman was convicted [120

---

[12]Specifically, Ms. Zoleko testified that it would be too difficult to estimate the amount of money that she lost from the time she acquired the properties until the time that the foreclosures took place; Mr. Davies used his own money (until he ran out) to repair the properties and pay the mortgages until the foreclosures took place; Mr. Doolittle took out over $1 million in mortgage loans and spent upward of forty thousand or more dollars to repair the homes that eventually went to foreclosure because he could not make the payments; and, Mr. Denaway spent at least forty-five thousand dollars repairing the properties, until he eventually could not afford the properties and the homes went to foreclosure.

[13]The exhibit and the loss calculations do not include Phyllis Sheneman's primary residence on Willow Creek in Mishawaka, Indiana (which was sold in June 2005), nor her subsequent primary residence located at 648 Guthrie in Ottawa, Illinois (which was purchased in March 2005).

case, DE 109-1, 111-1, sentencing exhibit 3]. The government represents that Phyllis Sheneman still owns the College Point properties [denoted as properties 8,[14] 9, and 10 on sentencing exhibit 3], and that it is unaware of whether Phyllis Sheneman is in default on these loans. Other than the properties still owned by Phyllis Sheneman, sentencing exhibit 3 reveals that losses were suffered upon the resale of 6605 North Artesian and 7021 Fabriano Place [denoted as properties 3 and 4] in the amounts of $265,500.00 and $240,650.00, respectively.[15] The mortgage company who issued the mortgage to Phyllis Sheneman on the North Artesian property was New Century, while Option One Mortgage Corp issued the mortgage to Phyllis Sheneman on the Fabriano Place property. Sentencing exhibits 4 and 5 reveal that US Bank is the current holder of these properties. Sentencing exhibit 3 also indicates that of the 3 remaining properties [denoted as properties 5, 6, and 7], 2 properties had their mortgages released and 1 property sold for a profit of $77,345.12.

The question of whether actual or intended loss sustained from the properties not within the counts of conviction in the 120 case constitutes relevant conduct is an easy one to answer. The closing of all eight properties occurred in only eight months and was clearly part of the same

---

[14]Relative to property 8, 3-25 125th College Point, New York, the government submitted a letter from an appraiser who estimated that the property's market value was $655,000 as of December 1, 2010 [120 case, sentencing exhibit 6]. During the sentencing hearing, defense counsel objected to the admission of the letter because it did not represent the actual report of appraisal. The Court took the objection under advisement and now admits the exhibit for purposes of sentencing given that it bears a "sufficient indicia of reliability to support its probable accuracy." *United States v. Tapia*, 610 F.3d 505, 514 (7th Cir. 2010). Moreover, the exhibit does not affect the Court's guideline calculations herein, because the properties still owned by Phyllis Sheneman need not be included in the loss calculation for the 16 level enhancement under § 2B1.1(b)(1)(I) to apply.

[15]Loss was calculated by taking the mortgage amounts less the sales price [sentencing exhibit 3].

scheme—Jeremie Sheneman alone used Phyllis Sheneman's good credit to secure the mortgages in her name, and did so by acting as a loan officer and by falsifying material loan application information relative to her employment income, the nature and scope of her consignment shop, the extent of her financial liabilities, the intended use of the properties, and the source of the purchase price funds. *See* § 1B1.3(a)(2) cmt. n. 9(A). Thus, using the same modus operandi, Jeremie Sheneman achieved his sole purpose of securing various mortgage loans which he otherwise could not have lawfully obtained from lenders. *Id.* Moreover, given the high degree of similarity of the offenses which occurred in a short time frame (so that the previously purchased properties would not be disclosed on subsequent credit reports of Phyllis Sheneman), the uncharged conduct was also part of the same course of conduct as Jeremie Sheneman's convictions. *See* § 1B1.3(a)(2) cmt. n. 9(B). Although all eight of the properties were not identified in the counts of conviction, the loss sustained by the lenders on some of these properties, as reflected in sentencing exhibit 3, is considered relevant conduct because Jeremie Sheneman was responsible for fraudulently procuring the mortgage loans during a common scheme and contemporaneous course of conduct.[16] However, the loss sustained by the lenders in the 120 case when combined with the loss sustained in the 126 case, does not exceed $2.5 million and the attendant 18 level increase in the offense level. Therefore, the Court concludes that Jeremie Sheneman's criminal conduct in the 120 and 126 cases resulted in a loss in excess of $1 million but less than $2.5 million. Accordingly, the 16 level enhancement under

---

[16]There is no dispute that the mortgage holders who recouped less than the full value of the original loans suffered actual loss determined under § 2B1.1(b)(1), including New Century and Option One Mortgage Corp, who are victims of Jeremie Sheneman's conduct as detailed, *see supra* at 12-14. §§ 1B1.3(a)(1), (a)(2), 2B1.1(b)(2)(A)(i).

§2B1.1(b)(1)(I) for causing a loss greater than $1 million is appropriate, and Jeremie Sheneman's objection is overruled.

## II. Number of Victims

Defense counsel originally challenged the PSR's application of a two level increase to the offense level under § 2B1.1(b)(2)(A)(i) because the offenses involved ten or more victims; however, Mr. Holesinger withdrew this objection during the evidentiary sentencing hearing and acknowledged that the government's sentencing exhibits resolve this issue. Thus, the objection is withdrawn and the Court finds that the enhancement is appropriate given the fact that the law of this circuit and the guideline provisions allow the Court to count as victims, those who sustained any part of the actual loss determined under § 2B1.1(b)(1) as a result of Jeremie Sheneman's conduct in both cases, which clearly involved 10 or more victims [126 case, DE 99-1, sentencing exhibit 1; 120 case, DE 109-1, 111-1, sentencing exhibit 3]. *Supra* footnotes 9, 12 and 16.

## III. Sophisticated Means

Defense counsel objects to an increase in the offense level under § 2B1.1(b)(10)(C) (formerly § 2B1.1(b)(9)(C)) for the use of sophisticated means.

Application note 8 to that section defines sophisticated means as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense," including, for example, "[c]onduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts." § 2B1.1 cmt. n. 8. The Seventh Circuit has "found that the enhancement is proper when the conduct shows 'a greater level of planning or concealment' than a typical fraud of its kind." *United States v. Knox*, 624

F.3d 865, 870-71 (7th Cir. 2010) (quoting *United States v. Wayland*, 549 F.3d 526, 528-29 (7th Cir. 2008)). The two level enhancement "is proper when the offense conduct, viewed as a whole, was notably more intricate than that of the garden-variety [offense]." *Knox*, 624 F.3d at 871 (citing *United States v. Jenkins,* 578 F.3d 745, 751 (8th Cir. 2009)).

Defense counsel argues that the mortgage fraud schemes at issue in the 120 and 126 cases were no more complex than typical frauds of their kind. Defense counsel believes that there is nothing sophisticated about filling out standard loan applications and closing documents or using certified checks at closing, and he argues that the mortgages were approved because the lending practices were loose at the time, not because Jeremie Sheneman's conduct was especially complex or intricate. The Court disagrees.

## The 126 Case

The Seventh Circuit confirmed in *United States v. Michael Sheneman,* that the 126 case involved sophisticated means relative to Michael Sheneman:

> [Michael] Sheneman and Jeremie [Sheneman] carefully orchestrated an intricate scheme that fooled buyers, sellers, and mortgage lenders, resulting in four unsophisticated buyers of limited means purchasing sixty properties. In doing so, they relied on their extensive knowledge of the real estate market and lending industry to perpetrate the scheme and avoid detection for several years. This was no simple scam: [Michael] Sheneman and Jeremie [Sheneman] utilized powers of attorney to conceal their activity; convinced buyers that the run-down properties would make sound investments; and fooled mortgage lenders into financing the purchases by falsifying loan documents, misrepresenting the source of down payments and closing costs, and artificially inflating buyers' bank accounts.

682 F.3d at 632 (citing *Knox*, 624 F.3d at 871-72) (defendant used fraudulent appraisals and false promises over a seven-year period to convince buyers into purchasing 150 overpriced properties, and falsified loan applications to fool mortgage lenders into financing); *Green*, 648 F.3d at 572, 576-77 (defendants acquired seventy properties over a three-year period using

fraudulent loan applications and fake documents to obtain mortgages); *United States v. Snow*, 663 F.3d 1156, 1163-64 (10th Cir. 2011) (defendant procured forty-four overpriced properties for unqualified buyers over a four-year period using fraudulent documentation and disguising buyers' financial standing)).

As the Court found with respect to Michael Sheneman, the Court holds that the case law and facts of the 126 case support the finding that Jeremie Sheneman used "sophisticated means" within the meaning of the guidelines. Jeremie Sheneman's scheme did not involve a single fraudulent act, but a complex series of fraudulent transactions. To accomplish his multi-layered plot, he and his father took unsavvy unqualified buyers around town with the intent of having them buy bundles of properties sight unseen, and without knowing which properties were ultimately purchased during the closings. His scheme required the use of a corporate mortgage entity, where Jeremie Sheneman himself processed the various fraudulent loans on 60 properties, forged loan documents, and knowingly used his father's money to pad the buyers' bank accounts and pay for the down payments. In so doing, Jeremie Sheneman's offense conduct involved the coordination of various moving parts of the scheme to fool many lenders into extending mortgages they otherwise would not have approved, all of which speaks to the scheme's sophistication. *Knox*, 624 F.3d at 871. Thus, the enhancement is appropriate in the 126 case.

**The 120 Case**

Similarly, the 120 case involved especially complex or intricate conduct pertaining to the execution and concealment of the offense. Jeremie Sheneman was not only clever enough to essentially use his grandmother's good credit to purchase the 8 investment properties (because he admittedly did not have good enough credit to obtain the loans in his name), but he used

Superior Mortgage to facilitate his access to the lenders and fooled half a dozen lenders into closing loans rapidly. Quick closings were key because as Phyllis Sheneman accumulated over $4.5 million worth of mortgage debt, the mortgage loans obtained earlier on during the scheme did not yet appear on subsequent credit reports. In fact, until the federal investigation began, Phyllis Sheneman did not know how many properties she had purchased or how much money each property cost. Phyllis Sheneman also did not know about various letters containing untruthful information which Jeremie Sheneman had forwarded to the brokers to satisfy loan conditions, nor did Phyllis know that Jeremie informed the lenders that he provided much of the purchase funds as a gift to Phyllis (and that he did so because he did not want the funds that he provided to be characterized as a loan or liability in Phyllis' mortgage loan applications as that might impact approval of the loans). As in the 126 case, Jeremie Sheneman did not simply place fraudulent information in loan applications to secure mortgages, but his conduct involved the coordination of various moving parts of the scheme which resulted in his convincing various underwriters to approve loans that Phyllis Sheneman could not otherwise have afforded and that Jeremie Sheneman could not otherwise have been approved for given his poor credit.

The evidence establishes that Jeremie Sheneman's chosen method to perpetrate his fraud involved a greater level of planning and concealment than a typical fraud of its kind, *see United States v. Ghaddar*, 678 F.3d 600 (7th Cir. 2012), and was sufficiently sophisticated within the meaning of the guidelines, such that the application of a two level increase under § 2B1.1(b)(10)(C) is appropriate in both the 120 and 126 cases. Accordingly, Jeremie Sheneman's objection is overruled.

## IV. Gross Receipts

Defense counsel objects to a two level increase in the offense level under guideline § 2B1.1(b)(15)(A) (formerly § 2B1.1(b)(14)(A)) for deriving more than $1 million in gross receipts from one or more financial institutions.

The two level increase at issue applies when a defendant, individually, "derived more than $1,000,000 in gross receipts" from one or more financial institutions as a result of the offense. § 2B1.1(b)(15)(A) cmt. n. 11(A); *see United States v. Weidner*, 437 F.3d 1023, 1046-47 (10th Cir. 2006) (noting that one defendant cannot receive a gross receipts enhancement for money actually received and controlled by another defendant). "'Gross receipts from the offense' includes all property, real or personal, tangible or intangible, which is obtained directly or indirectly as a result of such offense." *Knox*, 624 F.3d at 873 (citing § 2B1.1 cmt. n. 11(B)). The term "financial institution" refers not only to banks, credit unions, pension funds, and registered brokers and dealers, but also to "any similar entity whether or not insured by the federal government." *Id.* (citing § 2B1.1(b)(2)(A)(i) cmt. n. 1); *see also United States v. Goodson*, 358 Fed.Appx. 533, 536 (5th Cir. 2009) (unpublished opinion) (defining "any similar entity" to include mortgage lenders); *United States v. Edelkind*, 467 F.3d 791, 801-02 (1st Cir. 2006) (same) (citations omitted).

The government argues that Jeremie Sheneman individually derived more than $1 million in gross receipts in each of the cases, 120 and 126, and therefore the enhancement is proper in either or both cases. Relative to the 120 case, the government argues that Jeremie Sheneman "used" his grandmother's name and good credit to obtain the mortgage loans, but it was Jeremie Sheneman who falsified all of the loan applications and actually acquired the benefit of the loans

because he managed the properties and he expected to receive some of the profits from their rent and resale. Relative to the 126 case, the government admits that although it does not have financial records tracing $1 million in gross receipts directly to Jeremie Sheneman, the enhancement is proven by a preponderance of the evidence given that the entire scheme generated around $3.4 million in mortgage loans [government's trial exhibit 36]—all of which Jeremie Sheneman fraudulently generated. Further, there were only two participants who closely coordinated their efforts during the scheme and one of those participants, Michael Sheneman, transferred money to the other participant, Jeremie Sheneman, during the course of the scheme.

The government also believes that the money Jeremie Sheneman illegally gained in loan proceeds in the 126 case was then used to cover the closing costs for the properties purchased in the 120 case, based on the testimony of FBI forensic accountant L. Christopher Knight who indicated that in 2005 Jeremie Sheneman's bank account was receiving various large deposits ranging from $30,000 to $60,000 from real estate transactions that totaled almost a quarter of a million dollars [120 case trial transcript, vol. II, DE 80 at 178-82]. In fact, Jeremie Sheneman admitted at trial that he used at least $700,000 of his own money to fund the mortgage closings in the 120 case, and that this money came from real estate transactions completed in 2005 at Progressive Title in South Bend [120 case trial transcript, vol. III, DE 81 at 47-48], however it is unclear that this money actually came from the properties sold to the 4 buyers in the 126 case.

Defense counsel argues that the enhancement should not be applied because the government has failed to show that Jeremie Sheneman *himself* derived the benefit of $1 million. The Court agrees with defense counsel.

The appropriate application of the enhancement was considered by the Seventh Circuit in

*United States v. Knox*, 624 F.3d 865, 873 (7th Cir. 2010), *United States v. Serfling,* 504 F.3d 672 (7th Cir. 2007), and *United States v. Castellano*, 349 F.3d 483 (7th Cir. 2003). In *Knox*, the defendant procured properties either by buying them himself or causing them to be purchased under someone else's name, and then he "flipped" the property by selling it to an unwitting buyer at an exorbitant price supported by fraudulent property appraisals that inflated the property's value.[17] *Knox*, 624 F.3d at 868. The defendant helped buyers secure mortgage loans by placing false information in the buyers' loan applications which were then relied on by the lenders in extending the mortgage loans. *Id*. at 869. Knox would pocket the difference (after paying accomplices) between the true asking price and the exaggerated purchase price he represented to the buyer. *Id*. The Seventh Circuit concluded that based on the money Knox received from cashiers' checks, bank accounts, HUD-1 forms, and other documents, it was more likely than not that Knox's gross receipt calculation totaled more than $1 million. *Id*. at 873.

In *Serfling*, the defendant argued that he could only be held responsible for deriving $200,000 in mortgage loan proceeds which was disbursed directly to him when the mortgage for $11.75 million was issued to the defendant and his company. *Serfling,* 504 F.3d at 680. The defendant maintained that he did not own the property, but yet he did not dispute that his company took title to the property at closing, nor did he argue that the proceeds to his company could not be counted toward his individual gross receipts or suggest who else controlled the

---

[17]The defendant also used other strategies to lure buyers into the scheme, such as offering a $5,000 cash incentive for each property purchased, assuring the buyers that he would buy back the property (some of which turned out to be in disrepair or uninhabitable) if the buyer was later unsatisfied with the purchase, and promising to act as the property manager, including locating tenants, collecting rents, and making the loan payments directly to the lenders. *Knox*, 624 F.3d at 868-69.

property if not him. *Id.* The Seventh Circuit upheld the district court's conclusion that the defendant became the owner of the property upon the closing of the loan and derived the value of the property which exceeded $1 million. *Id.* However, in *Castellano*, the Seventh Circuit remanded the case and directed the district court to determine whether the defendant individually received $1 million in gross receipts based under Illinois veil-piercing principles, when the company that the defendant managed received loans from the bank and none of the money redounded to the defendant's benefit indirectly through the company's securities. *Castellano*, 349 F.3d at 486-87.

Applying these rules, it is clear that the government must prove by a preponderance of the evidence that Jeremie Sheneman, not Michael Sheneman, Phyllis Sheneman, or any other person, derived more than $1 million in gross receipts, directly or indirectly, as a result of his offenses.

## The 120 Case

The Court concludes that although mortgages worth over $4.5 million were placed in Phyllis Sheneman's name on account of Jeremie Sheneman's orchestrating the property purchases in the 120 case, the government has produced insufficient evidence to show by a preponderance that Jeremie Sheneman *individually* derived more than $1 million in gross receipts from one or more financial institutions as a result of his scheme to defraud. The trial testimony of Phyllis Sheneman and Jeremie Sheneman[18] indicates that Jeremie was previously successful at helping Phyllis with some investments, and therefore Phyllis approached Jeremie

---

[18]The Court also took into consideration the parties' supplemental filings [120 case, DE 131, 133].

with the idea that they should get involved in purchasing investment properties [120 case trial transcript, vol. I, DE 79 at 66-67; 120 case trial transcript, vol. III, DE 81 at 28].  Thus, when the two started investing in real estate, Phyllis knew that the properties were going to be put in her name because she had better credit, [vol. I, DE 79 at 68; vol. III, DE 81 at 25], and Jeremie admitted that he could not be listed as a borrower on the loan applications because his credit was poor, so he needed someone else to buy the properties [vol. III, DE 81 at 29, 43-44].

Phyllis confirmed that all of the properties were to be acquired on her behalf, yet she had no desire to deal with managing the properties [vol. III, DE 81 at 25-27]. Thus, Phyllis intended all along for Jeremie to arrange for the purchase of the properties, to manage and maintain the properties, and to find renters and make the mortgage payments, and eventually she planned to sell them for a profit [vol. I, DE 79 at 70, 79, 84, 88, 96; vol. III, DE 81 at 25-27].  Jeremie agreed that the properties were to be owned for the benefit of Phyllis and confirmed that they were "hoping the properties would go up in value and in about ten years we'd be able to sell them for a profit," and in the meantime, the plan was to rent them out for more money than what was required by the mortgage payments [vol. III, DE 81 at 28, 37, 67].

Given their arrangement, Jeremie did in fact do the footwork [vol. III, DE 81 at 37, 76]. Jeremie selected all of the properties to be purchased and Phyllis simply showed up at closings and signed her name to the loan documents because Jeremie told her to do so [vol. I, DE 79 at 70, 89, 95; vol. III, DE 81 at 42, 69].  Jeremie chose properties in New York because he was going to live there and he thought the property values would increase in a progressive city [vol. III, DE 81 at 29, 83].  In December 2007, Phyllis even gave Jeremie power of attorney to handle all transactions involving the New York properties because it was "convenient" for her, in that

she did not want to travel back and forth to New York or worry about taking care of the properties and payments [vol. I, DE 79 at 80-81; vol. III, DE 81 at 24-27; government's trial exhibit 6D].

Because Jeremie handled everything, in the end Phyllis actually had no idea how many properties were placed in her name or how much the properties cost [vol. I, DE 79 at 69-70]. She did recall giving Jeremie $100,000, but she knew that Jeremie was using a lot of his own money to purchase the properties [vol. I, DE 79 at 68, 71-74, 90]. Jeremie confirmed that he used $700,000 of his own money to meet all of the closing cost obligations and purchase the properties in his grandmother's name, and that this money came from real estate transactions completed in 2005 at Progressive Title in South Bend [vol. III, DE 81 at 43-48].

Given the evidence of record, the Court concludes that the government seeks application of the enhancement without sufficient evidence relative to the amount of benefit received by Jeremie Sheneman. Although one can reasonably infer that Jeremie invested $700,000 of his own money with the expectation that he would get something in return, this does not equate to an inference that Jeremie derived at least $1 million from the lenders when the properties were purchased for Phyllis Sheneman and placed in her name. There simply is no evidence establishing that Jeremie was paid for managing the properties, received any rents generated from the properties, or would receive $1 million upon the sale of the properties. Although the trial evidence establishes that Jeremie Sheneman chose the properties, placed materially false statements in the loan applications to secure the loans, provided the financial backing for the closings, helped schedule the closings, directed his grandmother to sign the loan and closing documents, and managed and maintained all of the properties (with Phyllis Sheneman ultimately

having no idea how many properties Jeremie had purchased or how much the properties cost), these facts only establish that Jeremie fraudulently acquired the loans for the benefit of his grandmother. And while it stands to reason he likely expected something in return for his efforts, the facts do not establish to what extent Jeremie benefitted. Simply because Jeremie Sheneman controlled the purchase of the properties and subsequently managed the properties for his grandmother, does not mean that he expected to receive (or did receive) $1 million in benefit from the scheme. Jeremie Sheneman eventually received a power of attorney over all of the New York properties, but this was also done for the benefit (and convenience) of Phyllis Sheneman, not Jeremie Sheneman.

The Court finds that the government is unable to prove that it is more likely than not that Jeremie individually controlled or received the benefit from these mortgage loans in an amount that exceeded the threshold of $1 million. Unlike the situation in *Knox* and *Serfling*, the facts of this case do not show that Jeremie Sheneman himself received a benefit from the purchase of the properties in the amount of $1 million, or that the benefit received by Phyllis Sheneman could be counted towards his individual gross receipts. *See Knox*, 624 F.3d at 873; *Serfling*, 504 F.3d at 680; *see also United States v. Gharbi*, 510 F.3d 550, 555-57 (5th Cir. 2007) (DeMoss, J., dissenting) (holding that the appropriate measure of "gross receipts" was the full face value of the loans because the defendant himself obtained and used the full loan amounts for his purposes). Even though Jeremie Sheneman caused the loans to be fraudulently lodged in the name of another, the Court is unable to conclude that at least $1 million of those loans were for his benefit. *See Castellano*, 349 F.3d at 485-87 (company's receipt of the fraudulent funds must be traced to the defendant); *Edelkind*, 467 F.3d at 800-01 (although the property was placed in

the wife's name, the enhancement was appropriate where the defendant used the fraudulently obtained money to finance a lavish lifestyle for himself and his family). As a result, the Court cannot say that the defendant himself more likely than not "derived" more than $1 million in gross receipts on account of his obtaining almost $4.5 million in illegal mortgage loans on his grandmother's behalf.

**The 126 Case**

Relative to the 126 case, the Court has concluded, that by virtue of relevant conduct, Jeremie Sheneman was involved in the sale of all 60 properties. However, whether or not Jeremie Sheneman derived $1 million in gross receipts from the sale of these 60 properties is another matter. At trial, Mr. Richard Urbanowski testified that the proceeds of the sales often went to Michael Sheneman, and that only $360,099.61 in direct sale proceeds went to Jeremie Sheneman's personal bank account (which was almost equal to the mortgage amounts on the same properties) [government's trial exhibit 47]. While the $360,099.61 in proceeds are considered gross receipts derived by Jeremie Sheneman alone, the Court has a more difficult time concluding that the $645,854.55 that was transferred from Michael Sheneman's accounts to Jeremie Sheneman's accounts from June through October 2005, was the result of the offense conduct. This money could not be traced as money derived from the 60 property sales, per Mr. Urbanowski. Thus, while there is a temporal connection between the 60 property sales and the $645,854.55 that was transferred to Jeremie from Michael, this temporal connection is not enough to show that Jeremie derived a $1 million benefit from the sale of the 60 properties. And while the mortgage loans generated by Jeremie and Michael Sheneman's scheme totaled $3.4 million [government's trial exhibit 36], again, the evidence shows that *both* Jeremie and Michael

received the benefits from these real estate deals, but not how much benefit *Jeremie alone* received.  Similar to the 120 case, the government's evidence in the 126 case does not sufficiently establish to what extent Jeremie benefitted from the scheme, let alone that the benefit to Jeremie was in excess of $1 million in gross receipts.

No doubt Jeremie Sheneman derived some benefit from the real estate transactions involved in the 120 and 126 cases.  However, Phyllis and Michael Sheneman also derived a benefit from the real estate transactions, and the government is unable to show by a preponderance that Jeremie Sheneman personally derived, either directly or indirectly, more than $1 million in gross receipts from the fraudulent schemes.  Accordingly, the increase under § 2B1.1(b)(15)(A) was not properly applied, and Jeremie Sheneman's objection is sustained.

## V. Vulnerable Victims

Guideline § 3A1.1(b)(1) provides for a two level increase in the defendant's sentence if "the defendant knew or should have known that a victim of the offense was a vulnerable victim." Application note 2 to § 3A1.1 provides that, for purposes of subsection (b), "vulnerable victim" means a person (A) who is a victim of the offense of conviction and any conduct for which the defendant is accountable under §1B1.3 (relevant conduct) and (B) who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct. § 3A1.1 cmt. n. 2.  The government need only establish that a single victim was vulnerable in order for the enhancement to apply. *United States v. Parolin*, 239 F.3d 922, 926-27 (7th Cir. 2001).  Elderly victims can satisfy the requirements of § 3A1.1(b)(1), when their financial investments and financial security are at issue. *See United States v. Sims,* 329 F.3d 937, 944 (7th Cir. 2003) (citing *United States v. Seward*, 272 F.3d 831, 841 (7th Cir. 2001);

*United States v. Stewart*, 33 F.3d 764, 770-71 (7th Cir. 1994); *United States v. Haines*, 32 F.3d 290, 293 (7th Cir. 1994)).

The Seventh Circuit has previously noted that "'vulnerability' is the sort of fact which the trial court is peculiarly well positioned to gauge because the trial judge is in the best position to use his observations of the demeanor of the criminal defendant and/or witnesses as well as having an opportunity to review and analyze each of the documents and exhibits and hear the testimony while observing the mental, physical, and emotional states of the victims in order to assist him with assessing the damages inflicted upon them." *United States v. Rumsavich*, 313 F.3d 407, 411 (7th Cir. 2002) (quoting *United States v. White*, 903 F.2d 457, 463 (7th Cir. 1990)).

The government seeks to employ this enhancement only in the 120 case and only based on the fact that Phyllis Sheneman was allegedly targeted by Jeremie Sheneman as a victim of his scheme on account of her familial relationship and her unwavering trust of Jeremie. In other words, the government does not argue that Phyllis Sheneman's age makes her vulnerable, but instead, it believes that she was "otherwise particularly susceptible to criminal conduct." § 3A1.1(b)(1), cmt. n. 2. The government relies on *United States v. Iannone,* 184 F.3d 214, 220 (3rd Cir. 1999) for its position that the enhancement should apply because (1) Phyllis was particularly susceptible or vulnerable to the criminal conduct; (2) Jeremie knew or should have known of this susceptibility or vulnerability; and (3) this vulnerability or susceptibility facilitated Jeremie's crime in some manner; that is, there was "a nexus between the victim's vulnerability and the crime's ultimate success." 184 F.3d at 220.

The Court finds that given the evidence introduced at trial and this Court's observation of

the witnesses, the government has not sufficiently shown that Phyllis Sheneman was particularly vulnerable or susceptible to Jeremie's criminal conduct or that Jeremie Sheneman knew or should have known of Phyllis Sheneman's alleged vulnerability. Phyllis Sheneman testified that prior to purchasing the properties involved in the 120 case, she had previously owned rental properties and her own business [120 case trial transcript, vol. I, DE 79 at 56-57, 62]. In addition, Jeremie Sheneman had previously assisted her with earning money from other successful investments and she trusted him then, as she does now [vol. I, DE 79 at 59, 62, 66, 68, 79-80; 120 case trial transcript, vol. III, DE 81 at 28]. Furthermore, Jeremie testified that he knew that Phyllis trusted him and he intended to take good care of his grandmother [vol. III, DE 81 at 70].

The Court finds that given Phyllis' background, she was not particularly susceptible to the criminal conduct, but instead had past success in making business and investment decisions. In this instance, Phyllis voluntarily decided to make a real estate investment during the housing market boom (albeit not near the size of the investment that Jeremie made), and it did not pay off in the end on account of the unforeseen housing market crash. Admittedly, Phyllis did not know the number of properties that Jeremie placed in her name, however, Phyllis gave Jeremie permission to use her name on the applications. To this day, Phyllis does not blame Jeremie, she blames the economy.

The Court believes that Jeremie Sheneman selected his grandmother, not because she unconditionally trusted her grandson, but because she and Jeremie had a history of making investment decisions together and her good credit would allow them to make further investments —in fact, this was the government's theory all along. Jeremie was in this to make money, not to

cheat his grandmother out of her life savings. *See Rumsavich*, 313 F.3d at 413-14 (the enhancement is appropriate when an unscrupulous person methodically schemes and plans to separate out those elderly and inexperienced investors in dire need of prudent investment planning and thereafter proceeds to cheat them out of their life savings). Due to the fact that Jeremie Sheneman did not target his grandmother because she was vulnerable or otherwise particularly susceptible to her grandson's fraud, the Court holds that a two level adjustment under guideline § 3A1.1(b)(1) for targeting a vulnerable victim is not appropriate here.

### VI. Special Skill

Defendant challenges the two level enhancement under guideline § 3B1.3 based on his using a special skill in a manner that significantly facilitated the commission or concealment of the offense. Defense counsel's argument is 2-fold: (1) no special skill was required to get a mortgage loan to close in either case, 120 or 126, and (2) application of the enhancement constitutes double counting when the Court also applies an enhancement for employing sophisticated means.

The government argues that special skill was used by Jeremie Sheneman in the 120 and 126 cases because Jeremie Sheneman became well versed in the lending business by becoming a loan officer prior to engaging in his schemes to defraud. The government asserts that this particular skill and knowledge was put to use when he placed the type of fraudulent information that was necessary to get the lenders to lend (as opposed to simply filling out the applications truthfully) and by his working directly with lenders to get the mortgages to close quickly. The government also believes that there is no double counting problem given that the guidelines do not prohibit the application of both enhancements under § 3B1.3 and § 2B1.1(b).

As § 3B1.3 of the guidelines states, "If the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels."  The commentary to the guideline explains that a "special skill" is a skill not possessed by members of the general public and usually requires substantial education, training or licensing. § 3B1.3 cmt. n. 4. "Examples would include pilots, lawyers, doctors, accountants, chemists, and demolition experts." *Id.*

The Court finds that Jeremie Sheneman's position as a loan officer and the knowledge he gained from that experience was instrumental to his fraudulently procuring the loans in both the 120 and 126 cases and constituted a special skill.  In both cases, Jeremie Sheneman, having previously worked as a loan officer before committing the crimes, knew exactly the type of false information that was required to be placed in the loan applications to get the mortgages approved and the manner in which the information needed to be submitted to perpetrate the offense and avoid detection of the fraud—knowledge and skill not possessed by members of the general public.  *See e.g. United States v. Grant,* No. 11-14578, 2012 WL 2360123 *2 (11th Cir. June 21, 2012) (unpublished opinion) (the defendant gained detailed knowledge of the loan application and loan processing procedures while he worked as a loan officer or mortgage broker before committing the fraud, and then used this special skill to commit the fraud by inflating the loan applicants' bank account balances and income, inflating the purchase price of the properties, and providing the down payments via cashier's checks); *United States v. Way*, 465 Fed.Appx. 391, 394 (5th Cir. 2012) (unpublished opinion) (holding that the position of trust enhancement applied because the defendant was a licensed loan officer working for a mortgage brokerage office who was expected by the lenders to perform due diligence in preparing loan packages and

submit accurate and truthful information in loan applications, and the defendant used her position and knowledge as a licensed loan officer to recruit borrowers, submit false loan applications and false verification information, to obtain and conceal loan proceeds, and to avoid problems with credit bureaus).

**The 120 Case**

Relative to the 120 case, the scheme worked because Jeremie Sheneman had knowledge of the lending process and underwriting standards given his previous employment as a loan officer at Tri State Mortgage. An average person would not have known to submit false information relative to Phyllis Sheneman's employment income, the nature and scope of her consignment shop, the extent of Phyllis Sheneman's actual financial liabilities, the intended use of the properties, and the source of the purchase price funds, to get the loans approved. Yet, Jeremie Sheneman had the wherewithal to secure the mortgages with the needed misrepresentations only because he previously worked as a loan officer before committing the fraud. While Jeremie Sheneman may not have endured the same level of training as a doctor, pilot, or lawyer, to become a loan officer, he certainly possessed a type of skill that could be acquired only with the requisite training or experience in the lending field, which is not possessed by members of the general public. *See e.g. United States v. Longwell*, 410 Fed.Appx. 684, 692 (4th Cir. 2011) (unpublished opinion) (holding that while mortgage brokers may not endure the same level of training as a doctor, pilot, or lawyer, they certainly possess a skill not possessed by members of the general public which is obtained through training and licensing, and qualifies as a special skill for the purposes of the enhancement).

**The 126 Case**

In the 126 case, Jeremie Sheneman similarly fulfilled his role in the scheme by working through Tri State Mortgage or Superior Mortgage, as a loan officer (despite his protestations to the contrary). Jeremie Sheneman utilized his personal knowledge of the lending process to make sure the loan applications were completed with the type of materially false information that would get the loans approved—information concerning the 4 buyers' employment income, assets, and citizenship, the source of the funds, the intended use of the properties, and the identity of the loan officer conducting the buyer interviews and completing the loan applications (who in reality was Jeremie Sheneman). Jeremie Sheneman was familiar with the lenders' underwriting requirements and he knew to personally process the paperwork to get the loans to close quickly. He also knew that it was important to have the 4 buyers close on various properties at once, so they would be stuck signing mass amounts of documents without having sufficient opportunity to read them. Again, Jeremie Sheneman used his knowledge and skill to significantly facilitate the commission of the offense which the general public would not normally possess without requisite training and experience in the lending field. *See United States v. Smith,* 332 F.3d 455, 458 (7th Cir. 2003) (affirming the district court's application of the special skill enhancement because the defendant's thefts and the delay in detecting the thefts were facilitated by his training and licensing as an over-the-road truck driver).

Moreover, application of enhancements for use of sophisticated means and a special skill in both the 120 and 126 cases does not create impermissible double counting, because the guidelines do not expressly prohibit it. *United States v. Vizcarra*, 668 F.3d 516, 519-20 (7th Cir. 2012); *United States v. Olis*, 429 F.3d 540, 549 (5th Cir. 2005) (the guidelines do not proscribe

the joint application of enhancements for sophisticated means and special skill).  Additionally, these guideline provisions serve different purposes.  The sophisticated means enhancement deters elaborate efforts to avoid detection by use of complicated criminal activity, *United States v. Landwer*, 640 F.3d 769, 772 (7th Cir. 2011), while the special skills enhancement is to punish those who use their personal talents to commit crime. *United States v. Rice*, 52 F.3d 843, 851 (10th Cir. 1995) (the purpose of the special skill enhancement is different than the purpose of the sophisticated means enhancement, and there is no double counting when both enhancements are applied).  Further, the Court avoids any double counting when applying enhancements for sophisticated means and special skill by using a sufficient independent factual basis for both adjustments. *See United States v. Minneman*, 143 F.3d 274, 283 (7th Cir. 1998) ("it's true that the factual basis for the two adjustments may overlap somewhat. But so long as the court finds a sufficient independent factual basis for both adjustments, it may impose both.").  The Court has applied the sophisticated means enhancement in the 120 and 126 cases based on the way that Jeremie Sheneman executed and concealed the offenses in an especially complex way—such as, use of his grandmother's name and a mortgage company to facilitate his access to lenders (in the 120 case), and using powers of attorney, convincing buyers that the run-down properties would make sound investments, and knowingly providing the down payments and closing costs and artificially inflating buyers' bank accounts (in the 126 case).  In effect, the sophisticated means enhancement focuses on the conduct employed to commit the fraud—the complicated plot used to commit the crime and avoid detection.  This *conduct* is different than Jeremie's personal *knowledge/skill*, which is an individual characteristic of the defendant that allows the application of the special skill enhancement.  Thus, the special skill enhancement applied in both cases

really focuses on Jeremie Sheneman's personal wherewithal, or understanding of the lending process and knowledge of how to commit the offenses. In essence, the sophisticated means used in the 120 and 126 cases was a product of Jeremie Sheneman's experience, training, and special skill, and therefore, both enhancements can apply without running the risk of double counting. Accordingly, the Court applies the enhancement for use of a special skill.

## VII. Obstruction of Justice

The PSR applies a two level enhancement consistent with guideline § 3C1.1 for Jeremie Sheneman's obstructing justice in the 120 case. Defense counsel does not object to the application of the enhancement, and the Court deems the enhancement proper.

The offense level is increased by two if "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to the defendant's offense of conviction and any relevant conduct; or a closely related offense." § 3C1.1.

Perjury is a well settled example of conduct that warrants an obstruction enhancement. *United States v. Vallar*, 635 F.3d 271, 288 (7th Cir. 2011). A defendant commits perjury "if, while under oath, he gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *United States v. Taylor*, 637 F.3d 812, 817 (7th Cir. 2011) (quoting *United States v. Dunnigan*, 507 U.S. 87, 94 (1993)). Application note 6 to § 3C1.1 defines as "material" any evidence, fact, statement, or information that, if believed, would tend to influence or affect the issue under determination. § 3C1.1 cmt. n. 6. "A simple denial of guilt cannot serve as a basis for an

obstruction-of-justice enhancement, but an elaborate mistruth regarding material facts of the counts alleged is more than sufficient to support the enhancement." *United States v. Dinga*, 609 F.3d 904, 909 (7th Cir. 2010) (citing *United States v. Hickok*, 77 F.3d 992, 1007 (7th Cir. 1996)).

Here, Jeremie Sheneman took the stand in the 120 case and provided a detailed story as to how the false information ended up in the loan applications. Jeremie Sheneman denied working at Superior Mortgage, denied processing loan applications and leaving them on the desks of his co-workers, denied providing any of the false information contained in the loan documents and blamed the mortgage brokers for inserting the falsities, and denied providing false rental information and other letters to satisfy conditions of the loan applications. Having presided over the trial in this case, the Court agrees with the parties that Jeremie Sheneman's testimony went beyond a simple denial of guilt, but was an elaborate explanation that was false, material, and willfully given. The Court believes that Jeremie Sheneman lied to the jury about matters crucial to the question of his guilt and that he knew precisely what he was saying in his trial testimony, and so testified willfully. Because Jeremie Sheneman was under oath when he knowingly made the false statements with the intent to deceive the jury and alter the outcome of his trial, the Court applies the obstruction of justice enhancement.

## VIII. Acceptance of Responsibility

The PSR indicates that Jeremie Sheneman will not receive any reduction for acceptance of responsibility under guideline § 3E1.1, and defense counsel admitted that Jeremie Sheneman would not be entitled to receive the reduction, regardless of whether the Court imposed the obstruction of justice enhancement. The Court agrees.

The defendant must clearly demonstrate acceptance of responsibility by a preponderance

of the evidence. *United States v. Lister*, 432 F.3d 754, 759 (7th Cir. 2005). It is appropriate for the Court to consider the non-exhaustive list of factors contained in application note 1 of guideline § 3E1.1, including truthful admission of the offense conduct, voluntary termination or withdrawal from criminal conduct or associations, voluntary surrender to authorities promptly after commission of the offense, voluntary assistance to authorities in the recovery of the fruits of the offense, post-offense rehabilitative efforts, and timeliness of the defendant's conduct in manifesting the acceptance of responsibility. § 3E1.1 cmt. n. 1. Per application note 2, the adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt (as opposed to going to trial to assert or preserve issues that do not relate to factual guilt). § 3E1.1 cmt. n. 2. Moreover, while an enhancement given by the sentencing court under § 3C1.1 for obstruction of justice does not automatically preclude a finding that the defendant also accepted responsibility for his crime, it generally suggests that the defendant has not accepted responsibility for his crime—a presumption that can be rebutted by the defendant only in "extraordinary cases." § 3E1.1 cmt. n. 4; *United States v. Black,* 636 F.3d 893, 900 (7th Cir. 2011).

Jeremie Sheneman cannot clearly demonstrate that he should receive a reduction for acceptance of responsibility. Here, Jeremie Sheneman went to trial in both cases in the hopes of convincing the jury that he did not intend to defraud lenders by knowingly participating in these schemes to defraud. Jeremie Sheneman argued that he was not responsible for the false contents of the loan applications in the 120 and 126 case, and put the government to the task of proving the essential elements of the charges. He then lied on the stand to convince the jury of his innocence in the 120 case. Moreover, Jeremie Sheneman continues to blame others for his own

actions in both cases. This is not the sort of genuine contrition that the acceptance of responsibility reduction seeks to award. Accordingly, the Court finds that Jeremie Sheneman will not be given credit for acceptance of responsibility.

## IX. Guideline Range

Based on the foregoing, the Court calculates the adjusted offense level to be 31 (rather than 35, due to the Court's declining to impose a 2 level gross receipts enhancement and a 2 level vulnerable victim enhancement). Jeremie Sheneman's lack of any criminal history points places him in category I, which, when combined with his total offense level of 31, results in a sentencing range of 108 to 135 months of imprisonment in Zone D of the sentencing table (as it would have been under the 2010 version of the guidelines). The guideline range for the fine is $15,000 to $150,000, consistent with guideline § 5E1.2.

## X. Restitution

Jeremie Sheneman does not object to the government's request for an order of restitution in the 126 case in the amount of $269,967.50, based on the same evidence submitted during the sentencing of Michael Sheneman, which was admitted during the evidentiary sentencing hearing of Jeremie Sheneman [126 case, DE 109-1, sentencing exhibit 2].

The Court is to order restitution to victims of offenses. *See* 18 U.S.C. §§ 3663(a), 3663A; § 5E1.1(a). Specifically, defendant Jeremie Sheneman's wire fraud convictions under 18 U.S.C. § 1343 fall within the Mandatory Victims Restitution Act, 18 U.S.C. § 3663A. *United States v. Locke*, 643 F.3d 235, 247 (7th Cir. 2011). Moreover, because a wire fraud conviction requires the government to prove that the defendant devised or participated in a "scheme to defraud," the Court is required, consistent with 18 U.S.C. § 3663A(a)(2), to order restitution for all victims of

the overall scheme of Jeremie Sheneman. *See* 18 U.S.C. §§ 3663A(a)(2) and 3663(a)(2) ("For the purposes of this section, the term "victim" means a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern.").

The government is required to prove the entitlement to restitution by a preponderance of the evidence. *United States v. Segal*, 495 F.3d 826, 837 (7th Cir. 2007). The government relies on sentencing exhibit 2 [126 case, DE 109-1] to demonstrate that restitution is appropriate because like Michael Sheneman, Jeremie Sheneman's conduct was part of a unitary scheme to defraud. The government seeks an order of restitution on the 15 properties wherein the victim (the holder of the fraudulently issued mortgage) has been identified, and requests that the amount be based on the difference between the mortgage amount (fifth column of government's sentencing exhibit 2) and the foreclosure bid (seventh column of government's sentencing exhibit 2), for a total restitution award of $269,967.50.

Here, the Court must determine if Jeremie Sheneman's counts of conviction comprise a unitary scheme to defraud and the Court must identify those victims who were directly harmed by Jeremie Sheneman's conduct in the course of committing his offense. *Locke*, 643 F.3d at 247-48. In determining whether Jeremie Sheneman's particular conduct comprised part of a unitary scheme to defraud, the Court considers the totality of the circumstances, including the nature of the scheme, the identity of the participants and victims, and any commonality in timing, goals, and modus operandi. *Locke*, 643 F.3d at 247 n.7. Notably, the restitution analysis is not the

same as the "relevant conduct" determination; however, as is the case with Jeremie Sheneman, the evidence supporting each overlaps, and the necessary findings ring similar on the record. *Id.*; *United States v. Randle*, 324 F.3d 550, 556-57 (7th Cir. 2003).

Accordingly, the Court incorporates by reference herein, the Court's summary of the trial evidence detailed in its order dated May 18, 2012 [126 case, DE 150 at 6-22]. The trial evidence reveals that Jeremie Sheneman's conduct consisted of an ongoing scheme to defraud which lasted, uninterrupted for approximately two years, 2003-2005. The nature of the scheme was to sell "bundles" of properties located in St. Joseph County, Indiana to 4 unsophisticated and unqualified buyers. In addition, the scheme was accomplished by a similar modus operandi, that is, the falsification of mortgage loan applications, deposits to the buyers' bank accounts to enable them to qualify for loans, payment of down payments on behalf of the buyers, and a series of misrepresentations made by Jeremie and Michael Sheneman to the buyers to entice them to buy multiple properties at the same time (and those misrepresentations very similarly concerned the condition of the properties, the status of tenants, the offer of assistance with fixing/renting/ reselling the properties, and the offer of excuses why the properties could not be viewed prior to their purchase (because they were occupied, under repair, or otherwise unable to be seen at the particular time requested by the buyer)). As mentioned, the participants were the same participants throughout the course of the scheme: it involved common victims—4 unsophisticated buyer victims who were not experienced with purchasing and managing multiple rental properties, and it involved common accomplices—a father/son team who acted in concert by using their knowledge of the real estate business and the lending practices of subprime lenders. The goal of the scheme was consistent throughout—to provide a quick monetary return

40

to Jeremie and Michael Sheneman by taking advantage of 4 unsavvy buyers and fraudulently securing 60 mortgages through common lenders.

As also explained in the Court's September 9, 2011 order relative to Michael's Sheneman's sentencing [126 case, DE 111], the scheme was extensive. The evidence at trial and sentencing links Jeremie Sheneman to all 60 properties and their mortgages. Of the 60 properties purchased by the 4 buyers, virtually all of the mortgages (excepting 4 Davies' properties) were brokered through Superior Mortgage or Tri State Mortgage where Jeremie Sheneman worked, and the 4 buyers testified that Jeremie Sheneman secured the mortgage funds by manipulating the loan applications. Jeremie Sheneman knew that Michael Sheneman was paying the down payments for the purchase of the properties and temporarily depositing money into the 4 buyers' bank accounts to artificially inflate the account balances in an effort to induce the banks to make mortgage loans to the otherwise unqualified buyers. The resulting loans which issued, enabled Jeremie and Michael Sheneman to sell their properties and the properties to which they had the power of attorney to sell for their financial benefit. Jeremie Sheneman is directly responsible for inducing the banks to make the mortgage loans on all 60 properties to the 4 unqualified buyers, all of which was part of a unitary fraudulent scheme.

Therefore, the Court agrees with the government that Jeremie Sheneman's conduct was part of a unitary scheme to defraud which involved the sale of all 60 properties. As such, the Court shall order restitution for the victims directly harmed by Jeremie Sheneman's criminal scheme—the identifiable final holders of the fraudulently issued mortgages.[19] Accordingly, the

---

[19]The Court realizes that the 4 buyers suffered losses directly attributable to Jeremie Sheneman's conduct; however, the government was unable to provide any information from which the Court could calculate those losses and the appropriate amount of restitution due.

Court will calculate restitution by taking the amount of the mortgage loans that Jeremie

Sheneman secured, less the amount of the foreclosure bids (which reflects either the amount of

money paid by a third party to the lender at sheriff's sale or reflects the lender's reasonable

estimate of the fair market value of the property which the lender hopes to recover upon its

eventual sale). *See United States v. Cage*, 365 Fed.Appx. 684, 687 (7th Cir. 2010) (unpublished

opinion) (citing *United States v. Allen*, 529 F.3d 390, 396 (7th Cir. 2008)).  This amount includes

only losses recoverable as restitution under the MVRA, and does not include any costs, let alone

unrecoverable costs. *See United States v. Havens*, 424 F.3d 535, 538 (7th Cir. 2005); *see also*

*United States v. Radziszewski,* 474 F.3d 480 (7th Cir. 2007) (remanding with instructions for the

court to omit attorneys' fees from its restitution calculation); *United States v. Scott,* 405 F.3d 615

(7th Cir. 2005).

Defense counsel admittedly had no objection to the Court's ordering restitution on the

basis of government's sentencing exhibit 2.  Accordingly, the Court intends to enter the

following order of restitution at the sentencing of Jeremie Sheneman (to be scheduled at a time

convenient for counsel):

**The Court's restitution order will be as follows:**

**Countrywide Home Loans, Inc.** in the amount of:                                    $ 26,750.00

**HSBC Bank USA** in the amount of:                                                   $ 16,750.00

**JP Morgan Chase Bank** in the amount of:                                           $ 25,037.50

**LaSalle Bank National Association** in the amounts of:                             $      900.00
    (Total amount to LaSalle Bank N.A. = $ 95,725.00)                       $   8,350.00
                                                   $ 14,325.00
                                                   $ 16,650.00
                                                   $ 55,500.00

**U.S. Bank N.A.** in the amounts of:                                      $ 13,850.00
     (Total amount to U.S. Bank N.A. = $81,600.00)         $   2,000.00
                                                               $ 24,675.00
                                                               $ 24,675.00
                                                               $ 16,400.00

**Wells Fargo Bank Minnesota, N.A.** in the amounts of:         $ 16,470.00
     (Total amount to U.S. Bank N.A. = $24,105.00)         $   7,635.00

**TOTAL RESTITUTION:**                                                    **$269,967.50**

     SO ORDERED.

     ENTERED:  July 16, 2012

                                           /s/ JON E. DEGUILIO
                              Judge
                              United States District Court